## MONSEN v. AMSINCK et al.

### (District Court, S. D. New York. December 19, 1908.)

1. Shipping (§ 195*) — General Average — Liability to Contribute — Advance on Freight.

A charter party provided that cash for steamer's ordinary disbursements at port of loading should be advanced by charterers, "if requested by master, at current rate of exchange, subject to insurance and 2½ per cent. commission." After loading the master requested an advance, which the charterers made, but took the master's draft therefor. *Held,* that since they were required by the charter to make the advance on freight if requested, and it did not appear that the master had authority to borrow otherwise, the advance must be regarded as an advance on freight, notwithstanding the fact that it was made on the master's draft and was not indorsed on the bill of lading, and that it was liable to contribution in general average, made necessary by the breaking of the vessel's shaft on the voyage and the incurring of liability for salvage services in consequence.

[Ed. Note.— For other cases, see Shipping, Dec. Dig. § 195.*

General average, see notes to Pacific Mail Steamship Co. v. New York H. & R. Mining Co., 20 C. C. A. 357; The Santa Ana, 84 C. C. A. 316.]

2. Shipping (§ 93*) — Bottomry — Construction of Contract — Master's Draft.

A master's draft, given for money borrowed to pay necessary disbursements of his vessel, payable from the first freight received, and for the payment of which the master pledged the vessel and freight, is equivalent to a bottomry bond, under the American authorities.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 93.*]

3. Shipping (§ 187*) — General Average — What Law Governs.

The law of the place of destination, where vessel and cargo separate, determines the rights of general average.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 600; Dec. Dig. § 187.*]

4. Shipping (§ 187*) — General Average — Liability to Contribute — Bottomry Loan — Portuguese Law.

By the law of Portugal a loan on bottomry is subject to general average contribution.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 187.*]

In Admiralty. Action to recover contribution in general average.

Wing, Putnam & Burlingham (Harrington Putnam, of counsel), for libelant.

Wallace, Butler & Brown (Frederick M. Brown, of counsel), for respondents.

HOLT, District Judge. This action is brought to recover the sum of $1,504.80, being the equivalent of £309.4.4, as a general average contribution alleged to be due from the respondents. The libelant, the owner of the Norwegian steamship Folsjo, in December, 1900, chartered the steamer to the respondents, G. Amsinck & Co., for a voyage from New York to Oporto, Portugal. The charter party contained the following clause:

"(15) Cash for steamer's ordinary disbursements at port of loading to be advanced by charterers, if required by master, at current rate of exchange, subject to insurance and 2½ per cent. commission."

---

Before the vessel sailed from New York, the master applied to the respondents for an advance of money, through Bennett, Walsh & Co., who were the agents of the owner of the Folsjo in New York. They had advanced various sums of money to the master, and in payment for supplies furnish the ship, amounting to £1,079.5.6, Mr. Wiltshire, cashier of Bennett, Walsh & Co., had charge of the matter of obtaining the funds from the respondents to balance the account. He accordingly applied to Amsinck & Co. for such funds. His statement of the transaction is that he asked them for the advance on the freight according to the charter party, and they said they would rather make the advance on the captain's draft; that he made no objection to giving the master's draft; that such draft was drawn, signed by the master, and indorsed by Bennett, Walsh & Co., and the cash on the draft received from Amsinck & Co. The version of this transaction given by Mr. Japp, the respondents' manager, is that some one from Bennett, Walsh & Co. applied to him, and asked him for an advance of freight, to be indorsed on the bill of lading, a day or two previous to the sailing of the ship. He states that he declined to make the advance on the bill of lading by indorsing the advance on it, but said that they would buy the ship's draft. This evidence is substantially corroborated by Mr. Ruperti, one of the respondents' firm, who was consulted by Mr. Japp upon the subject. The reason given by Mr. Japp and Mr. Ruperti for preferring to advance the money on a draft rather than to indorse the advance on the bill of lading is that, if they had paid part of the freight here in New York, they would have had to draw for so much more on the buyer at Oporto at 90 days' sight, which increased respondents' risk. The Folsjo, on her voyage from New York to Oporto, met with very heavy weather and broke her shaft. This necessitated her being towed from mid-ocean into the Azores by another steamer, which met her, and afterwards being towed from the Azores to Portugal, for which salvage service a large amount of salvage was recovered in a suit in England, and paid. This gave rise to a general average adjustment by an adjuster at Oporto, who found that there was due from the freight interest of the Folsjo for general average the sum of £554.11.1, which contributory sum was apportioned as follows:

Freight paid in advance.............................................£309. 4.4
     "     remaining at risk......................................... 245. 6.7
                                                                      _____
                                                                      £554.11.1

This suit is brought to recover from the respondents the sum of £309.4.4, for their contributory interest on account of freight paid in advance; the libelant having settled the general average adjustment with all other interests, and being entitled to receive this amount, if the respondents are liable to pay it to any one.

As freight is not earned until the successful completion of the voyage, moneys advanced on freight at the beginning of a voyage are liable to be lost, if the ship is lost or the voyage for any reason not completed. The interest, therefore, of a person who has made advances upon freight is insurable, while a person who has made a

simple loan of money to the owners on the master's draft, for which the owners are liable at law in any event, have no insurable interest in the ship, cargo, or freight. The principal test, therefore, whether or not an advance of money to the captain is an advance on freight is whether such advance is insurable. Hicks v. Shields, 26 L. J. Q. B. 205; Allison v. Bristol M. I. Co., 1 A. C. 209. This advance was not insured by the respondents, Amsinck & Co.; but Mr. Ruperti says that they assumed that Bennett, Walsh & Co. had insured it.

Section 15 of the charter party provided that the advance should be subject to insurance, and therefore any advance made under that section would be an advance on freight. The fact that an advance on freight is frequently indorsed on the bills of lading or on the charter party does not seem to me to be decisive. Such an advance is sometimes made by means of a master's draft, and the fact that a master's draft is given does not necessarily prevent the advance from being an advance on freight. The Red Sea [1895] Prob. 293, on appeal [1896] Prob. 20, 8 Asp. Mar. Law Cases, 102; Carver on Carriage by Sea, § 564. It does not appear in this case that the master had any power to bind the owner by obtaining advances from the charterers, except pursuant to section 15 of the charter party. The charterers were bound by section 15 of the charter party to make advances on freight if called for by the master; and, upon the whole, I think that the money advanced was advanced freight, notwithstanding the fact that it was not indorsed on the bill of lading and was advanced upon a master's draft. That being so, the adjuster, in my opinion, was correct in charging the charterers with their contributory share in general average, on the ground that they had an insurable interest in the ship.

The respondents' counsel asserts that this advance could not be considered an advance under section 15 of the charter party, because under that section only ordinary disbursements at port of loading are authorized to be advanced. The amount of this draft was £1,079.5.6. This was certainly a large amount for ordinary disbursements at port of loading; but not only is there no evidence that the disbursements were for anything else, but Mr. Walsh testifies that the vessel incurred the disbursements shown in the account, to cover which the draft was drawn. The respondents, Amsinck & Co., made no objection to the draft on the ground that it was too large for ordinary disbursements, or on any ground. The draft was duly accepted, and at maturity paid. It was presumably paid out of the first amount of freight received at Oporto, as provided by the terms of the draft. There is no evidence that the owner ever objected to the act of the master in drawing such a draft for such an amount, and I do not think that the court would be justified in holding that the money was not advanced under the provisions of section 15 of the charter simply on the ground that the amount was large.

But if this advance be regarded as a loan, instead of an advance on freight, it was, in my opinion, a loan on bottomry. The master's draft promised to pay £1,079.5.6—

"for necessary disbursements of my vessel at this port [New York], for the payment of which I hereby pledge my vessel and freight, and my consignees at the port of destination are hereby directed to pay the amount of this

obligation, from the first amount of freight received, for account of my said vessel."

Such a draft was equivalent to a bottomry bond, under the American authorities. The Pride of the Ocean (D. C.) 3 Fed. 162; The James L. Pendergast (D. C.) 30 Fed. 717; The Wyandotte, 145 Fed. 321, 75 C. C. A. 117; The Dora (D. C.) 34 Fed. 343. A loan on bottomry, under the American decisions, is not liable to contribute in general average, but the general rule is that the law of the place of destination, or where the ship and cargo finally separate, determines the rights of general average. Simonds v. White, 2 B. & C. 805; Inter. Nav. Co. v. Atlantic Ins. Co. (D. C.) 100 Fed. 317; Inter. Nav. Co. v. Sea Ins. Co. (D. C.) 124 Fed. 93; Lowndes on General Average, 248.

By the law of Portugal a loan on bottomry, or "contrato de risco," does contribute in general average (Com. Code, art. 631); but it is claimed that the master's draft does not comply with the Portuguese law in respect to the requisites of such a contract. The Portuguese law (Com. Code, art. 626) provides that such a contract shall conform to various requirements, among other things that it shall contain the signature of the lender, the premium expressed or agreed, a description of the ship, and the names and addresses of the lender and borrower; and it is claimed that these were lacking in this case. But the draft shows the name of the lender; there being no premium agreed on, it was not stated; and the name and description of the ship appear upon the face of the draft. I think that the draft in this case is in sufficient compliance with the requirements of the Portuguese law to constitute a contract of bottomry, or "de risco," under the Portuguese law; and, that being so, the amount which the respondents received in payment of the draft was properly chargeable with its proportionate liability in the computation of general average contribution.

My conclusion is that the libelant is entitled to recover the amount sued for, with interest and costs